# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VIRGINIA A. TAMMERO, | : | |
| | : | |
| Plaintiff, | : | No. 3:19-cv-02234 |
| | : | |
| v. | : | (SAPORITO, M.J.) |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## **<u>MEMORANDUM</u>**

This is an action brought under 42 U.S.C. §405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Virginia A. Tammero's ("Tammero") claim for disability insurance benefits under Title II of the Social Security Act.  This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 9, Doc. 10, Doc. 14). For the reasons stated herein, we will **AFFIRM** the decision of the Commissioner.

## I.     *Background and Procedural History*

Tammero is an adult individual born February 1, 1960, who was 55 years old at the time of her alleged onset date of disability—September 17, 2015. (Tr. 179). Tammero's age at the onset date makes her a "person of advanced age" under the Social Security Act. *See* 20 C.F.R. § 404.1563(d). Tammero graduated from high school in 1978 and has no specialized vocational training. (Tr. 192). Prior to her alleged onset date, Tammero worked as a driver, office manager, and purchasing agent. (Tr. 181).

On May 17, 2016, Tammero protectively filed for disability benefits pursuant to Title II of the Social Security Act. (Tr. 15). In her application, Tammero alleged that she became disabled beginning September 17, 2015, as a result of a pinched nerve in her neck, right elbow tear, herniated discs C5 and C6, broken left wrist, high cholesterol, and hyperthyroidism. (Tr. 191). Tammero's claim was initially denied on September 20, 2016. (Tr. 15). Thereafter, Tammero filed a timely request for an administrative hearing on September 29, 2016, and it was granted. (*Id*.). Tammero, represented by counsel, appeared and testified before ALJ, Gretchen M. Greisler, on September 13, 2018, in Syracuse, New

York. (Tr. 32). In addition, an impartial vocational expert ("VE"), Deborah Tucker also appeared and testified during the administrative hearing. (Tr. 15, 32). At the time of the hearing, Tammero was 58 years old and resided with her husband and 19-year-old daughter in Union Dale, Susquehanna County, Pennsylvania, which is in the Middle District of Pennsylvania. (Tr. 190).

In a written decision dated October 31, 2018, the ALJ denied Tammero's application for benefits. (Tr. 12). Tammero sought further review of her claim by the Appeals Council of the Office of Disability Adjudication and Review, but her request was denied for review on November 8, 2019. (Tr. 1). Tammero subsequently filed an appeal to this Court on December 31, 2019, arguing that the ALJ's decision was not supported by substantial evidence. (Doc. 1). On March 2, 2020, the Commissioner filed his answer, in which he maintains that the ALJ's decision was correct and in accordance with the law and regulations. (Doc. 5, at 2). This matter has been fully briefed by the parties and is ripe for decision. (Doc. 12; Doc. 15; Doc. 16).

On this score, Tammero's treatment history discloses that she suffers from a number of physical impairments, including left wrist

fracture, degenerative disc disease of the cervical spine and cervical radiculopathy, carpal tunnel syndrome, right lateral epicondylitis, degenerative disc disease of the lumbar spine, status-post hip replacement and trochanteric bursitis, and obesity. (Tr. 17). Due to her medical conditions, Tammero reported that she is unable to work because she has fluid that builds up around her neck and shoulders; her hands get cramped working on the computer; and she does not want to compromise her sobriety. (Tr. 18). Tammero further reported that she would not be able to do any of her past jobs because she experiences pain in her back, neck, and hands; she cannot stay focused; she cannot sit for long periods of time due to back pain; she has problems bending at the waist and had to get a hip replacement; and she experiences fatigue due to her prescription medication. (*Id*.).

In March 2015, Tammero was examined by Dr. Tamrat Bekele ("Dr. Bekele"). (Tr. 394). Upon examination, Tammero reported that she had arthralgias, joint and back pain, but did not have any muscle aches or weakness, or swelling in her extremities. (*Id*.). During Tammero's examination, Dr. Bekele noted normal muscle tone and motor strength, contractures, malalignment, tenderness, bony abnormalities and there

was normal movement of all extremities. (*Id*.). Dr. Bekele also noted that Tammero exhibited no cyanosis, edema, varicosities, or palpable cord. (*Id*.). Dr. Bekele assessed Tammero with acute sciatica. (*Id*.).

In August 2015, a cervical spine magnetic resonance imaging study revealed that Tammero had moderate left foraminal stenosis at the C3-C4 with mild left uncovertebral spurring, but no disc herniation. (Tr. 670). Additionally, Tammero had moderate central disc protrusion at C4-C5 contacting and indenting the ventral margin of the cord, demonstrating 4mm of caudal migration. (*Id*.). However, Tammero exhibited no disc herniation at the C5-C6, but there was diffuse posterior osteophytic ridging and bilateral uncovertebral spurring, mild central canal stenosis, moderate foraminal stenosis, right greater than left. (*Id*.).

In August 2015, Tammero was also examined by Dr. Joseph Chun ("Dr. Chun"). Upon examination, Tammero reported that she had cervical pain with numbness and tingling of the right hand diffusely and the right distal forearm. (Tr. 294). Tammero further reported that she was attending physical therapy for relief, but that the therapy was not for her cervical and right-hand symptoms. (*Id*.). On examination, Dr. Chun opined that Tammero's cervical range of motion was mild to moderately

restricted, predominantly in extension and right lateral tilt, which caused reproduction of the radiating right upper extremity symptoms and there was an increase in cervical pain throughout all planes. (*Id*.). A neurological examination, however, revealed normal results, except that Tammero's upper and lower extremities had mild right grip strength weakness 4/5. (Tr. 295).

Moreover, Dr. Chun reviewed Tammero's MRI images of the cervical spine from August 2015 and assessed cervical radiculitis due to C4-C5 disc herniation, multilevel neural foraminal narrowing and cervical myofascial pain with trigger points. (*Id*.). Dr. Chun recommended that Tammero have trigger point injections bilateral C4-C7 paraspinals and right upper trapezius and provided the claimant with a cortisone injection during her visit. (*Id*.). In September 2015, Dr. Chun noted that Tammero's structural and postural curves of her thoracic and lumbar spine were within normal limits, with no list or abnormal spine posturing. (Tr. 294).

In April 2016, an x-ray of Tammero's left wrist revealed a minimally displaced fracture involving the volar aspect of the distal radius. (Tr. 298). The x-ray also demonstrated that Tammero had an intra-articular

fracture and minimally displaced fracture of the ulnar styloid. (*Id*.). Upon examination, Tammero's wrist showed minimal swelling with tenderness to palpation over the distal radius and lunar styloid. (*Id*.). In June 2016, Tammero was examined by Dr. Jack Henzes ("Dr. Henzes") and reported that she experienced some improvement concerning the pain in her left wrist and was working with occupational therapy for range of motion. (Tr. 1565). An x-ray of her wrist demonstrated bone callus formation at the site of the fracture with no displacement of fracture fragments. (*Id*.).

In June 2016, when the cortisone injections ceased to provide relief, Tammero proceeded with an anterior cervical discectomy and fusion of the C5-C6 and C6-C7. (Tr. 490). Thirteen months after her surgery, Tammero was examined and reported that she experienced some improvement after surgery with minimal discomfort. (Tr. 1310). Further, x-rays demonstrated a well-positioned interbody cage and plating with good healing. (*Id*.).

In August 2017, Tammero was examined by Dr. Alan Gillick ("Dr. Gillick"). (Tr. 1311). Upon examination, Tammero reported that she was experiencing a lot of pain in her right hip and leg. (*Id*.). In April 2018, Dr. Gillick performed a left total hip replacement. (Tr. 1495-97). In July 2018,

Tammero was re-examined by Dr. Gillick, and he noted that Tammero was doing extremely well with little to no pain. (Tr. 1582).

## II.   *Legal Standards*

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Id.* § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions

from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether the claimant is disabled, but whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive disability benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a); *Id.* § 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment[1] that makes it impossible to do his or her previous work or any other substantial gainful activity[2] that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); *Id.* § 1382c(a)(3)(B); 20 C.F.R. § 404.1505(a); *Id.* § 416.905(a).

The Commissioner follows a five-step sequential evaluation process in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a); *Id.* § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or

---

[1] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *Id.* § 1382c(a)(3)(D).

[2] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; *id.* § 416.910.

equals a listed impairment;[3] (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC");[4] and (5) whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(a); *Id.* § 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 423(d)(5); *Id.* § 1382c(a)(3)(H)(i); 20 C.F.R. § 404.1512; *Id.* § 416.912; *Mason*, 994 F.2d at 1064. Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); *Id.*

---

[3] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

[4] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. § 404.1545(a)(1); *id.* § 416.945(a)(1). In assessing a claimant's RFC, the Commissioner considers all medically determinable impairments, including those that are not severe. *Id.* § 404.1545(a)(2); *id.* § 416.945(a)(2).

§ 416.912(f); *Mason*, 994 F.2d at 1064.

## III.  *Discussion*

In her October 2018 decision denying Tammero's claim for benefits, the ALJ evaluated Tammero's application for benefits at each step of the sequential process. In that decision, the ALJ first concluded that Tammero met the insured status requirements of the Social Security Act through December 31, 2020. (Tr. 17). At step one, the ALJ concluded that Tammero had not engaged in substantial gainful activity since September 17, 2015, her alleged onset date. (*Id*.). At step two, the ALJ found that the following impairments were medically determinable and severe during the relevant period: left wrist fracture, degenerative disc disease of the cervical spine and cervical radiculopathy, carpal tunnel syndrome, right lateral epicondylitis, degenerative disc disease of the lumbar spine, status-post hip replacement and trochanteric bursitis and obesity. (*Id*.).

At step three, the ALJ found that Tammero did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, during the relevant period. (Tr. 18). Between

steps three and four, the ALJ fashioned an RFC considering Tammero's limitations from her impairments:

> After careful consideration of the entire record, I find that [Tammero] has the [RFC] to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except [Tammero] can frequently reach in all directions except [Tammero] cannot reach overhead. [Tammero] must be allowed to change position for at least 5 minutes after sitting, standing, or walking for one hour. [Tammero] cannot tolerate concentrated exposure to extreme cold or vibration. [Tammero] cannot crawl, climb ladders, ropes, or scaffolds or work at unprotected heights or in close proximity to dangerous machinery.

(Tr. 18).

At step four, the ALJ found that Tammero was unable to perform any past relevant work. (Tr. 24). At step five, the ALJ determined that based on Tammero's age, education, work experience, and RFC, she had acquired work skills from her past relevant work that was transferable to other occupations. (Tr. 25). Specifically, the ALJ concluded that there were a significant number of jobs in the national economy that she could perform, including working as an identification clerk, insurance clerk, and call-out operator. (*Id*.).

Tammero contends that the decision of the ALJ is not supported by

substantial evidence of record and raises four issues on appeal attacking various aspects of the three occupations the ALJ relied on at step five of the sequential analysis to deny her benefits. (Doc. 12). We shall address each argument seriatim.

### A. Substantial Evidence Supports the ALJ's Finding that the Identification Clerk Job Constituted a Significant Number of Jobs in the National Economy

Tammero's first claim of error, challenges the ALJ's step five evaluation. (Doc. 12 at 4). Specifically, Tammero argues that the ALJ erred in concluding that the identification clerk job exists in significant numbers in the national economy. (Doc. 12, at 4-7). In this case, the ALJ identified three jobs that Tammero could perform, including the job of an identification clerk, an insurance clerk, and a call-out operator. (Tr. 25). In relevant part, the ALJ found that there were approximately 6,734 identification clerk jobs in the national economy, which constituted a significant number of jobs in the national economy. (*Id*.).

Tammero asserts that while the Third Circuit Court of Appeals has held that there is no bright line rule as to what constitutes a significant number of jobs, courts have found that identifying jobs in the low thousands is not sufficient. (Doc. 12, at 4-5). Thus, Tammero argues that

the ALJ erroneously concluded that the identification clerk job exists in significant numbers in the national economy, and this case should be remanded for reconsideration. (Doc. 12, 4-7).

In response, the Commissioner argues that Tammero's argument as to this issue is without merit. (Doc. 15, at 8-11). The Commissioner asserts that there is no precise estimate for what constitutes significant numbers of jobs under the Social Security Act. (Doc. 15, at 9). The Commissioner further contends that courts have held that even 200 jobs within a region constitutes a sufficient number of jobs to satisfy the Commissioner's burden of production at step five. (*Id*.).

The Social Security Administration will find that work exists in the national economy when it exists in significant numbers either in the region where an individual lives or in several other regions of the country. 20 C.F.R. § 404.1566(a). Particularly, work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which an individual is able to meet with his or her physical or mental abilities and vocational qualifications. 20 C.F.R. § 404.1566(b). The Court of Appeals has held that there is no precise estimate for what constitutes "significant numbers" of jobs under the

Social Security Act. *See Young v. Astrue*, 519 F. App'x 769, 773 (3d Cir. 2013); *see also* 20 C.F.R. § 404.1566. Courts, however, have found that 200 jobs in the regional economy is sufficient to establish the existence of work existing in significant numbers in the national economy. *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987). Courts have also found that 20,000 jobs or more is enough. *Young*, 519 Fed. App'x at 772 (finding that 20,000 jobs is a significant number); *Brininger v. Berryhill*, No. 3:16-CV-00903, 2017 WL 3634187 at *15 (M.D. Pa. Aug. 7, 2017) (finding that 74,470 jobs is enough).

In the present case, the Court finds that the ALJ did not err in finding that the identification clerk job constituted significant jobs in the national economy. At step five, considering Tammero's age, education, work experience, and RFC, the ALJ concluded that Tammero had acquired work skills from past relevant work that was transferable to other occupations existing in significant numbers in the national economy. (Tr. 25). Specifically, the ALJ concluded that Tammero could perform the following jobs: identification clerk (DOT# 205.362-022), 6,734 jobs existing in the national economy; insurance clerk (DOT# 219.387-014), 42,586 jobs existing in the national economy; and call-out

operator (DOT# 237.3367-014), 159,948 jobs existing in the national economy.

Tammero argues that the ALJ erred in finding that the identification clerk position existed in significant numbers in the national economy. (Doc. 12, at 4-7). Specifically, Tammero contends that 6,734 jobs does not constitute a significant number of jobs. (Doc. 12, at 4-6). In support of her argument, Tammero relies on *Sheerer*. *See Sheerer v. Saul*, No. 18-1261, slip op. at 4 (W.D. Pa. Feb. 14, 2020)(finding that jobs numbering in the low thousands that the claimant could perform is not sufficient to show a significant number of jobs in the national economy).

In *Sheerer*, at step five of the sequential analysis, the ALJ concluded that there were jobs in significant numbers in the national economy that the claimant could perform. *Sheerer v. Saul*, No. 18-1261, slip op. at 1 (W.D. Pa. Feb. 14, 2020). Specifically, the ALJ pointed out that the VE identified three jobs, with numbers in the national economy of 4,500, 1,400, and 700. *Sheerer v. Saul*, No. 18-1261, slip op. at 1 (W.D. Pa. Feb. 14, 2020). The *Sheerer* court held, however, that testimony from a VE that there are jobs in the national economy numbering in the low

thousands that the claimant could perform is not sufficient to demonstrate a significant number of jobs in the national economy. *Sheerer v. Saul*, No. 18-1261, slip op. at 2 (W.D. Pa. Feb. 14, 2020).

*Sheerer* is distinguishable upon the facts of this case, in that while Tammero is alleging that 6,734 identification clerk jobs is not sufficient to constitute a significant number of jobs in the national economy, the ALJ identified other jobs in significant numbers that she could perform. For example, the ALJ explained that there were 42,586 insurance clerk jobs available in the national economy, and 159,948 call-out operator jobs available in the national economy. (Tr. 25). Together, this amounts to over 202,000 jobs available in the national economy that Tammero can perform. (*Id.*).

As mentioned above, courts have held that 20,000 jobs or more is sufficient to establish the existence of work existing in significant numbers in the national economy. *See Craigie*, 835 F.2d at 58 (finding that 200 jobs is a significant number); *Young*, 519 F. App'x at 772 (finding that 20,000 jobs is a significant number); *Brininger v. Berryhill*, No. 3:16-CV-00903, 2017 WL 3634187 at *15 (M.D. Pa. Aug. 7, 2017) (finding that 74,470 jobs is enough). Accordingly, we find that the ALJ did nor err as

to this issue.

### B. Substantial Evidence Supports the ALJ's Finding that Tammero Can Perform the Job of an Insurance Clerk

Next, Tammero argues that the ALJ erred in finding that she could perform the job of an insurance clerk with transferable skills acquired from her past relevant work. (Doc. 12, at 7-9). Tammero further contends that the ALJ concluded that no additional skills would be needed for Tammero to perform the job of an insurance clerk. (Doc. 12, at 8).

Specifically, Tammero argues:

> A finding that claimant can perform other work while utilizing transferable skills at step five requires that the jobs under consideration must only utilize skills the claimant actually obtained in prior work and, as acknowledged in the ALJ's decision, not require any additional skills. SSR 00-4p (a skill "is acquired through the performance of an occupation that is above the unskilled level."); 20 C.F.R. § 404.1568(d) ("We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work . . .)."

(Doc. 12, at 7-8). Tammero asserts that the VE testified that other skills would be required to perform the insurance clerk job, including knowledge of insurance regulations or procedures, filing records, preparing vouchers, inserting data on applications, and notifying insurance companies of changes—skills not acquired from her past work.

(Doc. 12, at 8). Thus, Tammero contends that the ALJ's finding that she can perform the job of an insurance clerk with transferable skills acquired from her past jobs is contradicted by the VE's testimony, and meaningful judicial review is impossible. (Doc. 12, at 9).

In response, the Commissioner argues that the ALJ reasonably concluded that Tammero acquired skills in her past work that would be transferable to working as an insurance clerk, as identified by the VE. (Doc. 15, at 11). The Commissioner submits that the VE testified that the insurance clerk position involved other skills. (Doc. 15, at 13). However, the Commissioner asserts that the ALJ noted that based on the VE's testimony, Tammero's previous work was so similar to the jobs identified in this case, that very little vocational adjustment would be needed. (Doc. 15, at 14).

Under the regulations, there are different degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. 20 C.F.R. § 404.1568(d)(3). However, if a claimant is of advanced age, and the claimant has a severe impairment(s) that limits him or her to no more than sedentary work, the ALJ will conclude that the claimant has skills that are transferable to skilled or

semiskilled sedentary work, only if the sedentary work is so similar to his or her previous work that the claimant would need to make very little vocational adjustment in terms of tools, work processes, work settings, or the industry. 20 C.F.R. § 1568(d)(4).

When a finding is made that a claimant has transferable skills: (1) the acquired work skills must be identified, (2) the specific occupations to which the acquired work skills are transferable must be cited, and (3) evidence that these specific skilled or semi-skilled jobs exist in significant numbers in the national economy should be excluded. *See* SSR 82-41, 1982 WL 31389 at *1-8; *see also Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107-08 (3d Cir. 2011).

In this case, the ALJ found that Tammero could perform the job of an insurance clerk using transferable skills acquired from her past relevant work with approximately 42,586 jobs existing in the national economy. (Tr. 25). Based on the testimony of the VE, the ALJ also concluded that Tammero had acquired the skills from past relevant work that was transferable to other jobs that existed in significant numbers in the national economy, including identification clerk and call-out operator. (*Id.*).

Tammero argues that the ALJ erred in finding that she could perform the job of insurance clerk with transferable skills from her past work because additional skills (not acquired from her past work) would be needed. The Court is not persuaded by Tammero's argument as to this issue. Even assuming that the ALJ erred in finding that Tammero could perform the insurance clerk job, which may require additional skills, the ALJ identified other occupations that Tammero could perform, which existed in significant numbers. (Tr. 25). As mentioned above, the ALJ concluded that Tammero could work as an identification clerk (DOT# 205.362-022), 6,734 jobs existing in the national economy; and a call-out operator (DOT# 237.3367-014), 159,948 jobs existing in the national economy. (*Id.*). Thus, any error is harmless.

Therefore, for the reasons mentioned above, the Court finds that the ALJ has committed no error as to this issue.

### C. The ALJ Did Not Err in Relying on the Receptionist and Call-Out Operator Job

Next, Tammero argues that the ALJ erred in concluding that she could perform the job of a receptionist/call-out operator. (Doc. 12, at 9). Specifically, Tammero contends that in response to the hypothetical question posed, the VE testified that Tammero was capable of performing

the job of a receptionist (DOT# 237.367-014), with a specific vocational preparation ("SVP") of two. (Doc. 12, at 9).[5] Tammero argues, however, that an SVP two job level constitutes as an unskilled job, and by law and logic skills cannot transfer to unskilled work. (Doc. 12, at 9). Therefore, the ALJ erred in relying on the jobs of a receptionist/call-out operator to deny her benefits at step five of the sequential process. (*Id*.).

SVP is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for the average performance in a specific job-worker situation. DOT Appendix 3, 1991 WL 688702. Occupations with an SVP of two take no more than one month to learn. (*Id*.). The Commissioner's regulations define "unskilled" work as jobs requiring little specific vocational preparation that a person can usually learn within 30 days. 20 C.F.R. § 404.1568(a).

---

[5] SVP is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for the average performance in a specific job-worker situation. DOT Appendix 3, 1991 WL 688702. Occupations with an SVP of two take no more than one month to learn. (*Id*.). The Commissioner's regulations define "unskilled" work as jobs requiring little specific vocational preparation that a person can usually learn within 30 days. 20 C.F.R. §§ 404.1568(a).

Despite Tammero's contentions, the Court finds that the ALJ did not err in relying on the receptionist/call-out operator job. Particularly, the Court is puzzled by Tammero's argument as to this issue. Tammero is correct that skills cannot transfer to an unskilled job. However, the fact that Tammero can do more work due to her skillset, does not mean that she cannot perform less work.

Therefore, for the reasons mentioned above, the Court finds that the ALJ has not erred as to this issue.

### D. There is No Unresolved Conflict Between the VE's Testimony and the Information Contained in the Dictionary of Occupational Titles (DOT)

Tammero's final argument collectively challenges all three jobs relied on by the ALJ with regard to the RFC's reaching limitations. (Doc. 12, at 10-13). Specifically, Tammero argues that in the RFC, the ALJ limited her to sedentary work with no overhead reaching. (Doc. 12, at 10). Tammero asserts, however, that all three jobs relied on by the ALJ require either frequent or occasional reaching pursuant to the DOT. (Doc. 12, at 10-11). Therefore, Tammero contends that because all of the jobs identified by the VE have reaching requirements beyond the limitations identified by the ALJ's RFC and hypothetical question, the VE's

response, is not supported by substantial evidence. (Doc. 12, at 11).

In response, the Commissioner argues that there is no conflict between the DOT descriptions of the three jobs identified by the VE and the ALJ's RFC limitation to frequent reaching, except no overhead reaching. (Doc. 15, at 15). The Commissioner asserts that while the DOT indicates that these jobs require frequent reaching, the DOT does not address overhead reaching. (Doc 15, at 17). When the DOT is silent as to an issue, the VE may provide more detailed information concerning jobs or occupations. (*Id.*). In this case, in response to the ALJ's hypothetical question, which included the limitation concerning no overhead reaching, the VE identified the above three jobs. (*Id.*). Accordingly, Tammero's contentions on this issue are without merit.

The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and provides the qualifications needed to perform each job. *See McHerrin v. Astrue*, No. 09-2035, WL 2516433 at *3 (Aug. 31, 2010); *see also Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014). Generally, the occupational evidence provided by the VE should be consistent with the information contained in the DOT. *Zirnsak*, 777 F.3d at 617. To ensure consistency, adjudicators have an affirmative

responsibility to inquire about any potential conflicts between the occupational evidence provided by the VEs and the information set forth in the DOT. SSR 00-4p, 2000 WL 1898704 at *2.

Contrary to Tammero's contentions, the Court finds no conflict between the VE's testimony and the information contained in the DOT. In this case, the ALJ asked the VE to assume, among other things, an individual who can frequently reach in all directions, except the individual cannot reach overhead. (Tr. 64-65). In response, the VE testified that with Tammero's vocational qualifications and RFC, she could perform the occupations of an identification clerk and an insurance clerk. (Tr. 65). Tammero argues that the ALJ erred in relying on the jobs of identification clerk, insurance clerk, and call-out operator because each position requires occasional to frequent reaching in all directions. (Doc. 12, at 10-11). Specifically, Tammero asserts that each of the three jobs have reaching requirements in excess of the limitations specified by the ALJ. (Doc. 12, at 10).

The Court is not persuaded by Tammero's argument as to this issue. As correctly asserted by the Commissioner, while the DOT states that these jobs require frequent reaching, the DOT is silent on overhead

reaching. However, the regulations provide that a VE may provide more detailed information concerning jobs identified by the ALJ that are not available in the DOT. Thus, in response to the ALJ's hypothetical question, which included the limitation of no overhead reaching, the VE identified the above three jobs. As correctly indicated by the Commissioner, when an ALJ relies on a VE's expertise concerning specific limitations to which the DOT is silent, a conflict does not exist. *See Kowal v. Saul*, No. 18-1350, slip op. at *2-3 (W.D. Pa. Jan. 30, 2020); *see also Parker v. Colvin,* No. 13-1222, WL 4662095 at *9 (W.D. Pa. Sept. 18, 2014); *Philips v. Berryhill*, No. 15-5204, WL 2224931 at *7-8 (E.D. Pa. May 22, 2017). Thus, the ALJ is not obligated to resolve an inconsistency that does not exist.

Therefore, because the Court finds that there was no unresolved conflict between the VE testimony and the DOT concerning the jobs Tammero can perform, we will not disturb the ALJ's decision as to this issue.

An appropriate Order follows.


Dated: December 18, 2020                    ***s/Joseph F. Saporito, Jr.***
                                            JOSEPH F. SAPORITO, JR.
                                            United States Magistrate Judge